## STATE v. BILLY JOE ROBERTS, ALSO KNOWN AS WILLIAM EMERSON.

208 N. W. 2d 744.

June 15, 1973—No. 43572.

*C. Paul Jones,* State Public Defender, and *Philip Marron,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Rogosheske, Peterson, and MacLaughlin, JJ.

---

[1] Minn. St. 106.201, subd. 2.

MacLaughlin, Justice.

Defendant, Billy Joe Roberts, appeals from his conviction of aggravated assault with a dangerous weapon. Minn. St. 609.225, subd. 2. We reverse the judgment of conviction.

Defendant was accused of assaulting one George T. Clark in the early morning hours of June 19, 1971, in the Chestnut Tree restaurant in Minneapolis. Clark worked as a bouncer at Cassius Bar & Cafe in Minneapolis. He testified that he had had several disagreements with defendant in Cassius Bar, principally because defendant occasionally refused to leave when the bar was closing. After several incidents over a period of approximately 2½ months, Clark told defendant not to come back to Cassius Bar. At about 10:35 on the evening of June 18, 1971, after he had been instructed not to return, defendant again entered Cassius Bar and ordered a beer. Clark approached defendant and told him he was "barred out." Clark instructed the bartender to return the price of the beer to defendant, which was done. Defendant delayed for a few minutes but finally left the bar. Before leaving the bar, defendant told Clark, "I'm going to do something to you."

After Cassius Bar closed at about 1 a.m., the early morning of June 19, 1971, Clark went to the Chestnut Tree restaurant where he usually ate breakfast. As he was entering the restaurant, he saw defendant standing on the street nearby. Clark testified that he stood and watched defendant and that defendant left after 5 or 10 minutes. Clark then entered the restaurant and sat at a table with four friends. After 5 or 6 minutes defendant entered the restaurant. As defendant neared Clark's table, he suddenly made a sharp turn toward it. Clark testified that defendant then pulled a knife from under his shirt and "leaned" toward Clark. Clark said that he raised his hands, and the knife struck and severely cut his left hand. The two men scuffled, and defendant dropped the knife and was pinned against the wall by Clark, who is 6 feet 11½ inches tall and weighs 295 pounds. Clark testified that he was carrying a .38-caliber handgun on

the night in question and that he had a valid permit. Subsequently, a complaint against defendant was signed by Clark and defendant was arrested.

At trial, defendant argued self-defense. He testified that Clark had harassed him and threatened him with a gun on the night in question. Defendant said that when he entered the Chestnut Tree restaurant he observed Clark and that "all of a sudden [Clark] hit his pocket, and he jumped up, and I rushed over to him with the knife, and he run into the knife, and he grabbed me and the knife * * *."

There apparently were several eyewitnesses to the incident, but none testified. The manager of the Chestnut Tree restaurant, the arresting officer, the interrogating officer, and defendant's girlfriend—none of whom witnessed the incident—all testified.

The principal issue is whether the admission of certain testimony from the interrogating officer was reversible error. Officer Richard O'Brien interrogated defendant subsequent to his arrest. After proper Miranda warnings were given defendant, he willingly answered several questions during which he twice denied that he had stabbed Clark. O'Brien testified before the jury about this interrogation and then added the following:

"Q. Did you tell him anything about the fact that you only had the victim's side of the facts?

"A. Yes, sir. At that time I told him that all I actually knew about this was what the victim had told us, and if he wanted to tell me his side of the story, and I pointed out to him the victim was a rather large man, and at that time he told me that if he did—would have to approach the victim, that he would use something besides his fist, and I then asked him 'Well, did you?' and at this point he said that he would like to talk to his attorney first, so I terminated the conversation, told him the officers would be taking him upstairs and book him and when the booking process was completed, he could talk to his lawyer, and he was taken upstairs and booked."

Defendant contends that the admission of the question, "Well, did you [use something besides your fist] ?" and the answer that defendant wanted to talk to his attorney unfairly encouraged the jury to speculate that defendant had refused to answer the question because he was guilty. Defendant claims that, as a result, he was impermissibly penalized for exercising his constitutional rights to remain silent and to request an attorney.

In State v. Beck, 289 Minn. 287, 183 N. W. 2d 781 (1971), a case in which the defendant did not take the witness stand, we held that it was reversible error to admit testimony of an arresting officer that he had advised the defendant of his right to remain silent. We pointed out in Beck that the testimony was not intended as a foundation for the admission of a voluntary statement and added (289 Minn. 292, 183 N. W. 2d 784) :

"* * * The potential prejudicial effect, whatever the intent, was to encourage the jury to speculate that defendant had remained silent at the time of his arrest and that he did so because he was guilty; and, additionally, to encourage an adverse inference of guilt from defendant's failure to testify at the trial."

In a later case, State v. Combs, 292 Minn. 317, 195 N. W. 2d 176 (1972), the defendant had talked to an officer after having been given the Miranda warning and later testified on his own behalf. Since it appeared that evidence regarding the giving of the Miranda warning was admitted to provide a foundation for the admission of a subsequent statement by the defendant, we held it was not reversible error to admit the evidence of the Miranda warnings.

The state argues that the instant case is governed by the Combs case since defendant voluntarily engaged in conversation with the police, as Combs had. However, in Combs, there was a proper use for the admitted evidence of the Miranda warnings, i.e., a foundation for the admission of a subsequent statement. There was no such basis for the admission of the contested testimony in this case.

The state contends that we should distinguish State v. Beck, *supra*, because in that case the defendant stood on his rights from the very beginning and never chose to answer police questions voluntarily. The state argues, in effect, that once a defendant chooses to answer questions after the Miranda warnings are given, he is not free at a later point in time to discontinue answering questions. The state is clearly in error in that contention.

The United States Supreme Court in Miranda v. Arizona, 384 U. S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. ed. 2d 694, 707 (1966), stated:

"* * * The defendant may waive effectuation of these rights [the right to remain silent because any statement he does make may be used as evidence against him, and the right to the presence of an attorney, either retained or appointed], provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. * * * The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."

The court further stated (384 U. S. 473, 86 S. Ct. 1627, 16 L. ed. 2d 723):

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. * * * Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."

The court added the following in a footnote (384 U. S. 468, note 37, 86 S. Ct. 1625, 16 L. ed. 2d 720):

"In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation."

The court has thus clearly expressed the constitutional requirement that a defendant must not only be given the right to remain silent from the beginning of a custodial interrogation but also the right to become silent and to request counsel after some initial interrogation. It has also made clear that it is impermissible to penalize a defendant for exercising his constitutional privilege. We therefore hold that a defendant has the right to stop custodial interrogation at any time and that his assertion of right to counsel in the face of accusation does not become admissible merely because he previously chose to answer some questions.

The contested testimony of the interrogating officer, which included asking defendant, "Well, did you [use something besides your fist]?" and defendant's answer that "he would like to talk to his attorney first" had no legitimate probative value. The state contends that admission of the testimony is warranted because it is the only logical termination of the conversation with defendant. The state argues that without the testimony in question the jury would have been left with a "misleading" impression since the jury would have wondered why the police did not ask the ultimate question—did you commit the assault?—and that denying the jury the answer to the ultimate question would have invited rank speculation.

The record discloses that defendant had twice previously told the interrogating officer that he did not commit the crime, and this evidence was before the jury. It is highly unlikely that a jury would speculate that the interrogating officer was unreasonable in not asking the question a third time. Furthermore, the possibility of speculation by the jury resulting from a dangling conversation is insignificant compared to the probability of unfair speculation by the jury resulting from the disclosure of defend-

ant's choice to request counsel rather than to answer whether he committed the crime. We agree with the United States Court of Appeals for the Fifth Circuit, which stated in Walker v. United States, 404 F. 2d 900, 903 (5 Cir. 1968), that "[w]e would be naive if we failed to recognize that most laymen view an assertion of the Fifth Amendment privilege as a badge of guilt." Certainly, the evidence concerning defendant's conversation with the interrogating officer could have been reasonably concluded without the admission of testimony regarding either the question or the answer contested in this case.

We hold that the testimony by the interrogating officer that defendant requested counsel when asked if he had committed the crime had no legitimate probative value or any other proper use, and it was error to allow its admission. Since the jury was likely to infer from the testimony that defendant was concealing his guilt, admission of the testimony was constitutional error because its effect was to penalize defendant impermissibly for exercising his constitutional privilege.

The remaining question for determination is whether the error in admitting the testimony was prejudicial or merely harmless error. Before a Federal constitutional error can be held harmless, the court must be able to declare a belief that it is harmless beyond a reasonable doubt. State v. Beck, *supra;* Chapman v. California, 386 U. S. 18, 87 S. Ct. 824, 17 L. ed. 2d 705 (1967).

Based upon the evidence in this case, the jury could reasonably find defendant guilty. However, an important factor in the jury's determination was whether they believed defendant or the victim, Clark. There are substantial conflicts in the testimony of both defendant and Clark. No eyewitness testified. The testimony that defendant requested counsel rather than answering whether he committed the crime could reasonably have influenced the jury's decision. Therefore, we hold that the error was sufficiently prejudicial to require that defendant be granted a new trial.

Because of our decision to grant a new trial based upon the admission of the interrogating officer's contested testimony, we need not discuss or decide the other issues raised by defendant.

Reversed.