STATE of Minnesota, Respondent,

v.

Mohammed Gazizamil AL–
NASEER, Appellant.

No. A03–634.

Supreme Court of Minnesota.

Jan. 20, 2005.

John M. Stuart, State Public Defender, Rochelle R. Winn, Assistant State Public Defender, Office of the State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, Amy V. Kvalseth, Assistant Attorney General, St. Paul, MN, Lisa Borgen, Clay County Attorney, Moorhead, MN, for Respondent.

## OPINION

PAGE, Justice.

On June 16, 2002, the car driven by appellant, Mohammed Al–Naseer, struck and killed Kane Thomson while Thomson was changing a flat tire on the side of Highway 10 near Glyndon, Minnesota. As a result of Thomson's death, Al–Naseer was charged with and convicted of two counts of criminal vehicular homicide, one for gross negligence under Minn.Stat. § 609.21, subd. 1(1) (2004), and the other for leaving the scene of an accident under Minn.Stat. § 609.21, subd. 1(7) (2004). Al–Naseer was sentenced to 48 months in prison and ordered to pay restitution. The court of appeals reversed Al–Naseer's conviction for criminal vehicular homicide—leaving the scene of an accident, but affirmed the gross negligence conviction. In affirming, the court of appeals concluded, among other things, that the erroneous admission at trial of a videotaped interview Al–Naseer had given to the police the night of Thomson's death was harmless error and that the trial court's failure to instruct the jury on the lesser-included offense of careless driving was not error. Having granted limited review, we reverse and remand for a new trial.[1]

Al–Naseer is an Iraqi immigrant who arrived in the United States in 1994. He does not read or write in his native language and, although he was taking English classes, he has difficulty understanding English. The events culminating in Thomson's death began in the early morning hours of June 16, 2002. At about 2:00 that morning, Al–Naseer left his home in Fargo, North Dakota, and drove to Cass Lake, Minnesota, to do some work. Al–Naseer arrived in Cass Lake around 5:00 a.m., worked most of the day, and left Cass Lake at around 9:00 p.m. to drive back to Fargo. He testified that he had taken a 30– to 40–minute nap sometime during the afternoon.

That evening, Thomson and a friend, Dustin Leingang, met other friends at a speedway near Highway 10 not far from Glyndon, Minnesota. Thomson and Leingang were at the speedway until it closed at 11:00 p.m. As they left the speedway and drove onto Highway 10, both men realized that their car had a flat tire. Thomson, who was driving, pulled over to the shoulder of the road and stopped with the left side of the car approximately three feet from the fog line. The emergency hazard lights were turned on and the two proceeded to change the left rear tire. Thomson, who was 6′3″ tall and weighed between 250 and 280 pounds, changed the tire while Leingang held a flashlight for him. According to Leingang, when they were almost finished, he felt something brush his hand from behind. He spun to his right, heard a thump, and turned to see Thomson rolling on the ground in front of their car. He also saw the taillights of another car moving gradually from the fog line back to the active traffic lane. The car neither stopped nor accelerated. It continued heading west at approximately

---

**1.** On December 8, 2004, we issued an order, with written opinion to follow, reversing and remanding this case to the district court for a new trial.

55 miles per hour. Thomson was killed. Investigators at the scene concluded that the passing car might have encroached at least a foot over the fog line, but did not hit Thomson's car.

At some point, Al–Naseer, driving west of the accident site, realized that his headlights were not working properly. He testified that he stopped at a gas station in Glyndon and was surprised to see that the front right side of his car, including the headlight, was damaged. He decided to continue his drive home using his emergency hazard lights. A Dilworth police officer who had heard a report of the accident involving Thomson sought to pull Al–Naseer's car over when he saw it on Highway 10 moving slowly with its emergency hazard lights flashing and no headlights because he thought that the car might have been involved in the accident. Independent of the officer's action, Al–Naseer pulled over to the shoulder and stopped. Pulling in behind Al–Naseer's car, the officer got out of his car and approached Al–Naseer, who had by then gotten out of his car. Noting what appeared to be fresh damage to Al–Naseer's car, the officer asked Al–Naseer if he had hit something. According to the officer, Al–Naseer initially indicated that he must have hit something, but did not know what. Al–Naseer was arrested and taken to the local law enforcement center where he was interviewed by Trooper Daniel Prischmann. The interview, conducted without an interpreter, was videotaped.

At trial, over Al–Naseer's objection, a redacted version of his videotaped interview was admitted. Al–Naseer sought to have the lesser-included offense of careless driving submitted to the jury. The trial court declined. The jury convicted Al–Naseer as charged.

Al–Naseer raised a number of issues on appeal to the court of appeals. The court of appeals reversed the criminal vehicular homicide—leaving the scene of an accident conviction, but affirmed the gross negligence conviction. *State v. Al–Naseer*, 678 N.W.2d 679, 689, 697 (Minn.App.2004). In affirming the gross negligence conviction, the court of appeals concluded that the admission of the videotaped interview was error because Al–Naseer had not knowingly, voluntarily, and intelligently waived his right to counsel or his right to remain silent. *Id.* at 691. The court went on to conclude, however, that the error was harmless based on Al–Naseer's stipulation that his car was involved in the accident, his testimony that he was tired on the night of the accident, the testimony of the police officers who arrived at the scene, the testimony of Leingang, and the testimony of the accident reconstructionist. *Id.* at 692. The court of appeals concluded that the contents of the videotaped interview did not contain any additional information except to show Al–Naseer's confusion about what had happened, and thus did not significantly add to the testimony at trial. *Id.*

Relying on *State v. Pelawa*, 590 N.W.2d 142, 148–49 (Minn.App.1999), *rev. denied* (Minn. Apr. 28, 1999), the court of appeals further held that the trial court was not required to give an instruction on careless driving "because Thomson was not just endangered but died as a result of the accident." *Al–Naseer*, 678 N.W.2d at 696.

As he did in his appeal to the court of appeals, Al–Naseer raised a number of issues in his petition for review to this court. In granting review, we limited the issues to (1) whether the error in admitting the videotaped interview was harmless [2] and (2) whether the trial court erred

2. The question of whether the court of ap-       peals erred in concluding that the admission

in refusing to instruct the jury on the lesser-included offense of careless driving.

## I.

■ A conviction may stand when the trial court erroneously admits at trial a criminal defendant's statement to the police in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), if the error was harmless beyond a reasonable doubt. *State v. Juarez*, 572 N.W.2d 286, 291 (Minn.1997). An error is harmless beyond a reasonable doubt if the guilty verdict actually rendered in the trial was surely unattributable to the error. *Id.* at 292.

■ When determining whether a jury verdict was surely unattributable to an erroneous admission of evidence, the reviewing court considers the manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defendant. *Townsend v. State*, 646 N.W.2d 218, 223 (Minn.2002) (citing *State v. Ferguson*, 581 N.W.2d 824, 833 (Minn.1998)). "[O]verwhelming evidence of guilt is a factor, often a very important one, in determining whether, beyond a reasonable doubt, the error has no impact on the verdict." *Townsend*, 646 N.W.2d at 224 (citing *Juarez*, 572 N.W.2d at 291). But the court cannot focus on the evidence of guilt alone. *Townsend*, 646 N.W.2d at 224; *see also Juarez*, 572 N.W.2d at 291 n. 6 (acknowledging that the court had inadvertently misstated the significance of the strength of the evidence of guilt in harmless error analysis in *State v. Townsend*, 546 N.W.2d 292, 297 (Minn.1996)).

Was the error in admitting Al-Naseer's videotaped interview at trial harmless beyond a reasonable doubt? Al-Na-

seer argues that the error was not harmless because the state relied heavily on it to obtain the guilty verdicts. He notes that the state's references to the interview in its opening statement, closing argument, and direct and cross-examination of witnesses were used to point out inconsistencies between his statements during the interview and his trial testimony and to attack his credibility. He further notes that the jury heard him ask for an attorney and state that he should not say anything on the videotape. Al-Naseer contends that the jury may have viewed his request for counsel and the invocation of his right to remain silent as a "badge of guilt."

In response, the state argues that independent, overwhelming evidence supported each element of gross negligence and that the showing of the videotaped interview provided no basis for acquittal. Specifically, the state points to evidence indicating that Al-Naseer intended to drive from Cass Lake to Fargo after having been up since 2:00 a.m. on the morning of the accident, that Al-Naseer was tired but decided to drive home anyway, and that the circumstances of the accident were such that, in order for Al-Naseer to have hit Thomson without knowing it, he had to have fallen asleep at the wheel. The state further argues that any attack on Al-Naseer's credibility using the videotaped interview was intended to show that Al-Naseer knew that he had hit something, an element that went to criminal vehicular homicide—leaving the scene of an accident, not gross negligence, and that the interview did not effectively discredit the defense's theory of the case. Finally, the state responds to Al-Naseer's badge-of-guilt argument by simply noting that the admissibility of the statement is not before the court. Based on these arguments, the

of the videotaped interview was improper is

not before us in this appeal.

state contends that the guilty verdict was surely unattributable to the error in admitting the videotaped interview. We disagree.

Review of the record indicates that Al–Naseer is correct in his characterization of how the state used the videotaped interview at trial. For example, to discredit Al–Naseer, the state used the videotaped interview in its opening statement to challenge Al–Naseer's veracity:

> In fact, the stipulation before the Court is Mr. Al–Naseer's vehicle did indeed strike and kill Kane Thomson. But the defendant, Mr. Al–Naseer, does not say that. He says, "I hit something."
>
> He's brought in for questioning to the Law Enforcement Center. He is sat down by * * * Dan Prischmann [who was] in charge of the accident. Mr. Prischmann * * * will talk to Mr. Al–Naseer. You'll see portions of that statement.
>
> Mr. Al–Naseer is asked again what happened. Mr. Al–Naseer will say, "I don't know."
>
> He will then be asked, "Did you hit something?"
>
> Mr. Al–Naseer will then give an inconsistent statement. He will now tell Officer—or Trooper Prischmann, "I didn't hit anything."
>
> When Trooper Prischmann will come back to him and say, "Well, did you tell Officer Froemke and Officer Fleury that you hit something ten miles before you were stopped?" Mr. Al–Naseer denies that. "I didn't say that."
>
> "Well, did you hit anything?"
>
> "No. I hit nothing."

The state went on to quote more exchanges between Trooper Prischmann and Al–Naseer to show that the statements by Al–Naseer were not consistent.

Defense counsel responded in his opening statement: "[Al–Naseer] gave a videotaped interview to Trooper Prischmann. He also was completely candid with everybody he talked to, but the only statements he really made were, 'I don't know. I don't know.' "

The content of the videotaped interview was also discussed during the examination of witnesses. For example, when Trooper Prischmann was called to the stand, the state asked only a few background questions before a redacted version of the videotaped interview was shown. Defense counsel had little to ask about the statements made on the tape, but focused his effort on confirming that Al–Naseer was not under the influence of any alcohol or drugs. On redirect, the state asked whether the witness believed Al–Naseer understood the questions during the interview and the answer was in the affirmative.

In cross-examining Al–Naseer, the state repeatedly questioned whether Al–Naseer's memory was better at trial than when he talked to Trooper Prischmann immediately after the accident. The state also repeatedly questioned the consistency of the statements that Al–Naseer gave at trial as opposed to his interview.

Before closing arguments, the court instructed the jury, " 'Gross negligent' [sic.] requires no conscious or intentional action that the defendant knew or should have known created an unreasonable risk of harm to others." But in closing argument, the state reiterated the jury instruction on gross negligence and went on to say:

> You'll remember the comments about questioning, when the defendant, up here, when they asked him, "If you had known you hit him would you have stopped? Would you have talked to those people?" Whether he knows it happened or not is irrelevant. His in-

tent is irrelevant. "Gross negligence" requires no intentional act.

* * * [H]is sole fault was falling asleep, that is sufficient gross negligence with which to support [the charge of criminal vehicular homicide—gross negligence.]
* * * *

We're talking about the degree of inattention that he has, folks. We're talking about someone who is so asleep by his own admission that he can go through an accident with that much devastation and not come to, and have absolutely no remembrance of going through the accident in any fashion. Is that by itself gross negligence in the operation of his vehicle? The State would argue the evidence shows that it is.

In rebuttal closing argument, the state again argued that Al–Naseer "testified repeatedly today completely differently than what he did when he talked to Prischmann" in the videotaped interview.

Therefore, even though the trial court instructed the jury that Al–Naseer's intent was not an element of gross negligence, the state appears to have argued to the jury that Al–Naseer's lack of memory of the accident, as evidenced by his inconsistent statements, was in itself evidence of gross negligence.

■ It is clear from the record that the state repeatedly raised the issue of Al–Naseer's inconsistent statements, examined state witnesses about the interview, and cross-examined Al–Naseer about what he had said in the videotaped interview as opposed to his testimony at trial in such a manner that appears to have been intended to and likely did persuade the jury that Al–Naseer was not telling the truth. While these challenges to Al–Naseer's credibility and veracity went to the criminal vehicular homicide—leaving the scene of the accident charge, they also called into question his credibility and veracity with respect to the gross negligence charge. As a result, we cannot say that the jury's verdict was surely unattributable to the erroneously admitted interview. We are also troubled by the fact that the interview contained statements by Al–Naseer in which he asks to speak with a lawyer and indicates that he should not talk further without one. It is not unusual for juries to view such statements as a "badge of guilt." See State v. Roberts, 296 Minn. 347, 353, 208 N.W.2d 744, 747 (1973) (quoting Walker v. United States, 404 F.2d 900, 903 (5th Cir.1968)). That problem is compounded when the erroneously admitted evidence is used to depict the defendant, as was done here, to be untruthful.

In summary, we conclude that the guilty verdict was not "surely unattributable" to the erroneous admission of the videotaped interview and hold that the error was not harmless beyond a reasonable doubt.

## II.

■■ Next, we turn to the issue concerning the trial court's failure to give the lesser-included offense instruction. A trial court *must* submit an instruction on a lesser offense when: (1) the offense in question is an "included" offense; and (2) a rational basis exists for the jury to convict the defendant of the lesser offense and acquit him of the greater crime. State v. Nystrom, 596 N.W.2d 256, 261 (Minn. 1999). Unless waived by the defendant, it is error not to submit a lesser-included offense except in those extraordinary cases in which the failure to do so is otherwise supported by a proper exercise of the trial court's discretion and no prejudice to defendant results. State v. Leinweber, 303 Minn. 414, 422, 228 N.W.2d 120, 126 (1975).

Both Al–Naseer and the state agree, as do we, that careless driving is a lesser-included offense with respect to criminal

vehicular homicide—gross negligence. The issue we must decide is whether the evidence provided a rational basis for the jury to convict Al–Naseer of careless driving and acquit him of criminal vehicular homicide—gross negligence. Al–Naseer argues that it did. Factually, Al–Naseer argues that a careless-driving instruction was warranted because Thomson was "changing his tire on the side of the highway, at night, crouched inches from the fog line" and that his car "did not stray so far over the fog line" so as to hit Thomson's car. He also notes that he did not have alcohol or drugs in his system. Legally, Al–Naseer argues that in this case and in *State v. Pelawa*, the court of appeals appears to assume that any motor vehicle accident resulting in death is the result of gross negligence. In support of that argument, he points out that in *Pelawa* the court of appeals held that "there is no rational basis for a jury to have found that appellant drove in disregard of his victims' rights or in a manner that endangered them, but did not drive in a grossly negligent manner that killed them because the victims were not only endangered but killed by appellant's driving." *Pelawa*, 590 N.W.2d at 147–48. Al–Naseer notes that in this case the court of appeals indicated, as it did in *Pelawa*, that because the victim was not just endangered but died as a result of the accident, the trial court was not required to give an instruction on the lesser-included offense of careless driving. *See Al–Naseer*, 678 N.W.2d at 696. Thus, he argues that the court of appeals has improperly focused its attention on the result of his conduct rather than on the conduct itself. Finally, he argues that this case is not the extraordinary case that would justify a refusal to give the lesser-included-offense instruction.

The state responds that gross negligence does not require any conscious or intentional action and that the evidence of gross negligence here was so overwhelming that an acquittal on that charge would not have been justified. The state also argues that submitting a lesser-included instruction of careless driving in a case such as this runs the risk of the jury returning a verdict based on sympathy.

■ Whether conduct constitutes gross negligence is a question for the trier of fact, here, the jury. *See State v. Ewing*, 250 Minn. 436, 445–46, 84 N.W.2d 904, 911–12 (1957). Examples of extraordinary cases can be found in three of our recent cases involving defendants being tried for first-degree murder who sought a jury instruction on the lesser-included offense of first-degree manslaughter (heat of passion). *See State v. Carney*, 649 N.W.2d 455, 462 (Minn.2002) (holding that as a matter of law there was no rational basis for jury to find that the killing was in the heat of passion); *State v. Stewart*, 624 N.W.2d 585, 591 (Minn.2001) (holding that as a matter of law there was "no rational basis for a jury to find that [the defendant] killed [the victim] in the heat of passion"); and *Nystrom*, 596 N.W.2d at 262 (holding that the defendant failed to establish words or acts sufficient to provoke a person of ordinary self-control). In each case, the trial court declined to give the lesser-included instruction. In each case, we held that there was no error because, on the record presented, the defendant failed to establish a necessary element of first-degree manslaughter (heat of passion). Therefore, in each of these cases, there was no basis as a matter of law for giving the instruction.[3]

---

**3.** An intentional killing may be mitigated to first-degree manslaughter (heat of passion) when: (1) the killing was committed in the heat of passion; and (2) the passion was provoked by such words or acts of another as would provoke a person of ordinary self-con-

█ We have never held that falling asleep at the wheel is, as a matter of law, gross negligence and we decline to do so on the facts presented here. Notwithstanding the state's argument to the contrary, and unlike the circumstances in *Carney, Stewart,* and *Nystrom,* the facts present in the record here would permit a jury, acting rationally, to convict Al–Naseer of careless driving and to acquit him of criminal vehicular homicide—gross negligence.

A person is guilty of criminal vehicular homicide resulting in death if the person causes the death of a human being as a result of operating a motor vehicle "in a grossly negligent manner." Minn.Stat. § 609.21, subd. 1(1) (2004). Comparatively, a person who operates a vehicle "carelessly or heedlessly in disregard of the rights of others, or in a manner that endangers or is likely to endanger any property or any person," is guilty of careless driving. Minn.Stat. § 169.13, subd. 2 (2004).

█ In the context of careless driving, carelessness is synonymous with ordinary negligence. *State v. Meany,* 262 Minn. 491, 505, 115 N.W.2d 247, 257 (1962). Ordinary and gross negligence differ in degree. *State v. Bolsinger,* 221 Minn. 154, 159, 21 N.W.2d 480, 485 (1946). In *Bolsinger,* we adopted the definition of "gross negligence" found in *Altman v. Aronson,* 231 Mass. 588, 121 N.E. 505, 506 (1919):

> Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care. It amounts to indifference to present legal duty, and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence. * * * Ordinary and gross negligence differ in degree of inattention * * *[4]

*Id.* at 159–60, 21 N.W.2d at 485. Although *Bolsinger* was decided in 1946, the principles set out there are still valid today.

█ To determine whether a defendant engaged in gross negligence or ordinary negligence, the defendant's conduct must be examined. Specifically, it is the conduct that led to the defendant's falling asleep at the wheel, not the conduct that takes place while the defendant is asleep. *See* Annotation, *Criminal Liability of Motor Vehicle Operator for Accident Arising from Physical Defect, Illness, Drowsiness*

---

trol under like circumstances. *See State v. Brocks,* 587 N.W.2d 37, 41 (Minn.1998); *see also* Minn.Stat. § 609.20(1) (2004).

4. We note that this definition of "gross negligence" does not include any suggestion that the result of the conduct plays a role in determining whether the conduct constitutes gross negligence. Nor do we believe that the result of the conduct plays any role in that determi-

nation. Therefore, we conclude that, while the accident victim's death is a necessary element to be proved in order to establish criminal vehicular homicide, it is not an element that must be proved to establish gross negligence. Any holding to the contrary in the court of appeals' decision in *Pelawa* is expressly overruled.

*or Falling Asleep,* § 3, 63 A.L.R.2d 983, 988–92 (1959, Later Case Serv.1994 & Supp.2001); *see also, e.g., Conrad v. Commonwealth,* 31 Va.App. 113, 521 S.E.2d 321 (1999) (affirming the conviction of involuntary manslaughter based on criminal negligence because the defendant motorist fell asleep while driving after he had been up for 22 hours without sleep and had dozed off a few times while driving, but chose to continue driving a long distance home early in the morning); *McDaniel v. State,* 506 So.2d 360 (Ala.Crim.App.1986) (holding that a driver's knowledge of tiredness and sleepiness was more than sufficient to support his conviction of criminally negligent homicide). In assessing that conduct, the fact finder should take into account factors such as lack of sleep, length of time at the wheel, presence of sure warning signs, influence of drugs or alcohol, and strenuous activities before driving when determining whether there was gross negligence or ordinary negligence. *See* Annotation, *Physical Defect, Illness, Drowsiness, or Falling Asleep of Motor Vehicle Operator as Affecting Liability for Injury,* §§ 25–30, 28 A.L.R.2d 12, 51–57. (1953 & Later Case Serv.1995).

In this case, the jury, as fact finder, was not given a jury instruction on the lesser-included offense of careless driving and therefore was not in a position to weigh whether Al–Naseer's conduct constituted gross negligence or ordinary negligence. This was error. Therefore, Al–Naseer is entitled to a new trial.

Reversed and remanded for a new trial.